UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    Criminal Case No. 3:12-CR-00652-KI

               Plaintiff,

                    v.                    OPINION AND ORDER

**ROBERT PAUL PATTON**,

               Defendant.

    S. Amanda Marshall
    United States Attorney
    District of Oregon
    Gary Y. Sussman
    Assistant United States Attorney
    1000 SW Third Avenue, Suite 600
    Portland, Oregon  97204

        Attorneys for Plaintiff

Whitney P. Boise
Megan E. McVicar
Hoevet, Boise & Olson, P.C.
1000 SW Broadway, Suite 1500
Portland, Oregon  97205

      Attorneys for Defendant


KING, Judge:

Defendant Robert Paul Patton is charged with one count of Possession of Child Pornography, in violation of 18 U.S.C. §2252A(a)(5)(B) and (b)(2).  Before the court are Defendant's Motion to Suppress Evidence and for a Franks Hearing [17], Defendant's Motion to Suppress Evidence of Child Pornography [15], and Defendant's Motion to Suppress Evidence Obtained from Warrants Lacking Specificity [19].  For the reasons below, I deny the motions.

## FACTS

The underlying investigation began on October 17, 2011 when the Tigard Police Department learned a 12-year-old boy, DG, wanted to report his 15-year old brother, MG, missing.  DG thought MG was being sexually abused by an adult male, Rudy Moses Lemus.  A Tigard police officer went to the boys' home and found both DG and MG there.  After speaking with them, he referred the case to the Beaverton Police Department due to the boys' reports of sexual activity at a Beaverton nightclub, DK Wilds.

Detective Andler, Beaverton Police Department, took over the investigation on October 18, 2011 and interviewed DG, MG, and several of their friends[1] numerous times.  On February 17, 2012, Detective Goodwin, Portland Police Bureau, began investigating allegations of

---

[1]  To be consistent with DG's and MG's statements, I will refer to their acquaintances by their nicknames–Angelica and Jonny–and not their legal names.

abuse against DG and MG occurring in Multnomah County. Defendant Patton was one of the targets of the Multnomah County investigation.

On June 8, 2012, Detective Goodwin obtained warrants to search Patton and his residence and vehicle. The warrant also permitted the seized items to be submitted to the Oregon State Crime lab for testing. Officers executed the warrant on June 13, 2012 and seized several computers, cell phones, and thumb drives.

Detective Goodwin obtained a second warrant on June 27, 2012 to authorize the Northwest Regional Computer Forensic Laboratory ("NWRCFL"), which is a separate entity from the Oregon State Crime Lab, to search the digital items seized during execution of the first warrant.

## DISCUSSION

I.  <u>Franks Hearing</u>

Patton claims the affidavit supporting the search warrants recklessly or intentionally omitted material evidence and contained material misrepresentations which prevented a finding of probable cause to search his home, seize electronic devices located there, and search the devices. Patton seeks an evidentiary <u>Franks</u> hearing to attack the veracity of the statements in the affidavit.

The government admits the affidavit contains a few inaccuracies but contends there were no deliberate or reckless materially false representations or omissions sufficient to trigger a <u>Franks</u> hearing. Even when the inaccuracies are corrected, the government claims the affidavit still contains ample probable cause to search for images depicting the sexual exploitation and abuse of children.

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing in which he can attack the veracity of a search warrant affidavit or challenge the omission of material facts in the affidavit.  When a defendant seeks a Franks hearing "based on allegations of material false statements or omissions in an affidavit supporting a search warrant, a defendant must make a substantial preliminary showing that false or misleading statements were (1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) necessary to the finding of probable cause."  United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011) (internal quotations omitted).

More specifically, five requirements must be satisfied before a defendant is entitled to a hearing under Franks:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

United States v. Perdomo, 800 F.2d 916, 920 (9th Cir. 1986); United States v. Craighead, 539 F.3d 1073, 1080 (9th Cir. 2008) (to justify a Franks hearing, a defendant must make specific allegations, allege a deliberate false statement or reckless disregard for the truth, and support the claim with a detailed offer of proof).

The effect of the misrepresentations and omissions on the existence of probable cause is considered cumulatively.  United States v. Stanert, 762 F.2d 775, 782 (9th Cir.), amended on other grounds by 769 F.2d 1410 (9th Cir. 1985).  If, after a hearing, the defendant establishes by a preponderance of the evidence that the false statements or omissions were intentional or reckless,

and the remaining material in the affidavit is insufficient to support a finding of probable cause, the search warrant is invalidated and the evidence suppressed.  Franks, 438 U.S. at 156. "[O]missions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause."  Chism v. Washington State, 661 F.3d 380, 398 (9th Cir. 2011) (internal quotation omitted).

"Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Rodgers, 656 F.3d 1023, 1028 (9th Cir. 2011) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983)).  The magistrate may draw reasonable inferences when making the probable cause determination.  United States v. Gourde, 440 F.3d 1065, 1071 (9th Cir. 2006).

A.      Alleged Material Omissions

Patton argues Detective Goodwin withheld material facts from her affidavit that, if included, would undermine the reliability of the other statements and negate probable cause.

1.      Related Criminal Charges Pending Against Angelica and Jonny

In her affidavit, Detective Goodwin stated the Washington County investigation resulted in the arrests of Victor Gonzales-Sanchez and Kelvin Leon-Morales and the indictment of Rudy Moises Lemus.  She omitted that the investigation also resulted in Angelica's arrest for seven counts of Using a Child in a Display of Sexually Explicit Conduct, Luring a Minor, Sodomy in the Second Degree, and Sodomy in the Third Degree and Jonny's arrest for Sex Abuse I, Luring a Minor, Sex Abuse II, and Sex Abuse III.

According to Patton, Detective Goodwin relied on Angelica and Jonny as primary sources of evidence without mentioning their arrests, and he referred to them as friends of MG, DG, and

Patton.  Patton claims the failure to include the arrest information deprived the magistrate of information bearing on Angelica's and Jonny's credibility and motivation to lie to improve their own situations.

The government argues Angelica made the statements contained in the affidavit months before his arrest, and the statements Jonny made after his arrest were duplicative of the statements he made to Detective Andler before his arrest.  The government filed Detective Goodwin's declaration with its response in which she explained she knew of the arrests prior to drafting her affidavit and knew they were for various offenses against DG, MG, or both, but was uncertain of the precise nature of the conduct.

Even though Angelica and Jonny had not been arrested when they made the majority of the statements, they knew Detective Andler was investigating sexual misconduct against DG and MG, and they should have realized that they could be implicated.  Thus, the men could have shaped their statements to deflect attention away from themselves.  Detective Goodwin easily could have found out the details of the charges from Detective Andler and included them in the affidavit.  The magistrate needed the information to judge the credibility of the statements.  I will discuss the effect of this conclusion in the summary section below.

    2.      Jonny's Inconsistent Statements

The affidavit states that on February 10, 2012, Detective Andler spoke to Jonny about the night Jonny, DG, MG, and Angelica slept at Patton's house; DG and Jonny were in bed with Patton while Angelica slept on the floor.  The affidavit gave a summary:  (1) Jonny said Patton made out with DG; (2) Detective Andler asked Jonny what he saw; (3) Jonny said kissing and

jacking off; and (4) Jonny said Patton and DG were under the blanket so he did not see them jacking off but he heard them kissing.

Patton notes Detective Goodwin failed to include the background of the two conversations taking place on February 10, 2012.  In the first conversation, Detective Andler asked Jonny if he knew about a hand job between Patton and DG; Jonny said that he only knew about kissing. Detective Andler then arrested Jonny and interviewed him a second time, during which Jonny claimed he saw kissing and jacking off, a statement he revised later in the conversation to include only kissing.  Patton argues Detective Andler told Jonny what information he wanted (that a hand job occurred) and gave him an incentive to lie after his own arrest.

The government notes Detective Goodwin included the inconsistent statements in her affidavit, thus allowing the magistrate to make a credibility determination.  The government also notes the transcript of Detective Andler's in-custody interview of Jonny records the following:  (1) Detective Andler told Jonny it is a good thing for him to be honest because he might need Jonny to convict Patton; and (2) several times Jonny stated DG and Patton probably were jacking off, but Detective Andler prompted Jonny to only say what he saw or heard, and not what probably happened under the blanket.

At oral argument, defense counsel claimed Detective Andler offered to help Jonny if Jonny helped prosecute Patton.  I do not agree this accurately summarizes the interview, which stated in relevant part:

Andler:     You're going to be–you're a witness in that, okay?

Jonny:     Right.

Andler:        Uhh.  And that's a good thing for you to be honest about because maybe we need you to convict Rob [Patton].

Def.'s Mem. in Supp. of Mot. to Suppress and for Franks Hr'g. at 20.

Detective Andler suggested he might need Jonny's testimony to convict Patton but he did not offer a quid pro quo.  The affidavit contains enough information about the interviews, including the change in Jonny's story, for the magistrate to determine how much credibility to give Jonny's statements.

3.    <u>Dressing Up at Patton's Residence</u>

The affidavit states MG told Detective Andler that he and DG were at Patton's house during the summer of 2011, and they dressed up as women.  According to MG, DG asked if they could spend the night there and they did, with DG and Patton staying alone in Patton's bedroom.

Patton notes the affidavit failed to explain that DG, MG, Jonny, and Angelica dressed in women's clothes at Patton's house that night because they planned to go to the Escape nightclub dressed in drag and decided to use Patton's house as a place to get ready.  Patton dropped them off at the club.  Patton contends the omission of this information allows the inaccurate inference that Patton encouraged them to dress that way and that they stayed at his house the entire evening.

The government contends the affidavit does not invite the inferences Patton suggests, but only recounts statements DG, MG, Jonny, and Angelica made about dressing in drag.  The government suggests the important fact is that DG spent the night with Patton, in his bed, where Patton sexually abused DG.

I agree with the government.  The reason the group dressed in women's clothing and the fact that the group spent part of the evening at the nightclub are not material to the probable cause

determination. The material fact is that DG and Patton spent the night alone in Patton's bedroom. Omitting the other information was not an error.

### 4. DG Running Away in March 2012

The affidavit explains DG ran away from home for nearly 48 hours on March 12, 2012. It also states Detective Andler spoke to MG on March 23, 2012, and MG reported DG said he had been with Patton.

Patton notes that in a later email, Detective Andler stated when he questioned DG directly, DG said he spoke with Patton by phone when he ran away but did not see or visit him. According to Patton, the failure to include this information in the affidavit allowed the magistrate to draw a connection between Patton's former home in Portland, where the criminal conduct with DG allegedly took place, and Patton's new home in Milwaukie, which was searched nearly a year after the alleged crime occurred. Patton argues the full information on DG's whereabouts shows there was little support for probable cause to search a home a year after the alleged crime, in a different location with no connection to the alleged crime, and where the alleged victim, DG, had never been. Patton also argues DG's statement directly contradicts MG's statements and undermines MG's credibility.

The government notes the information in the affidavit accurately reports what MG told Detective Andler. In addition, the government points out other links between Patton's new residence in Milwaukie and his offenses against DG: (1) DG knew Patton moved to Milwaukie; (2) DG and Patton had ongoing contact, at least by phone; (3) Patton was unlikely to discard during the move the photographs he had taken of DG; and (4) evidence of text messages and call logs between the two were still likely to be found on Patton's cell phone, which he likely had with

him at the new residence. The government thus argues the fact that DG spoke to Patton by phone in March 2012, rather than visiting in person, did not negate the probable cause in Detective Goodwin's affidavit.

I agree with Patton that the affidavit should have explained DG denied seeing Patton in person when Detective Andler questioned him directly. I will discuss this point further in the summary section. The information was important to the magistrate when considering DG's and MG's credibility. I agree with the government, however, that the affidavit includes numerous links between Patton's new residence in Milwaukie and his offenses against DG sufficient for the magistrate to conclude there was a fair probability that evidence of sex crimes against DG would be found in the new home.

B.     Alleged Intentionally or Recklessly False Statements

Patton contends the affidavit contains statements that were either deliberately false or made in reckless disregard for the truth. When the false statements are corrected, Patton claims the affidavit does not support a finding of probable cause.

1.     October 26, 2011 Interview of Angelica

The affidavit states that on October 26, 2011, Angelica told Detective Andler that Patton's friend Jonny told Angelica that Patton and DG had sex at Patton's house around the end of July 2011, specifically that DG gave Patton a blow job in Patton's bedroom and Jonny touched DG's penis.

Patton notes Detective Andler documented his interview with Angelica in two different police reports. Both reports state that Angelica told Detective Andler that Jonny told Angelica that in July 2011, Jonny, Patton, and DG slept in Patton's bedroom. During the night, Jonny gave

Patton a blow job when DG was in the room and Jonny grabbed DG's penis. Thus, Patton argues Detective Goodwin falsely attested Angelica reported *Patton* having sex with DG when Angelica actually reported *Jonny* having sex with DG. Patton further contends this false statement goes well beyond a simple scrivener's error.

The government admits Detective Goodwin made a scrivener's error on the name but argues the error was not a deliberate or reckless falsehood. Detective Goodwin made notes of the evidence on which she relied to draft the affidavit. The notes have the correct names, and she provided the notes to two deputy district attorneys and Detective Andler for review. Moreover, the government argues there is more than enough other evidence to establish probable cause, even if this paragraph is deleted from the affidavit.

I will discuss the effect of this conceded error in the summary.

       2.      <u>Patton's Criminal History</u>

Detective Goodwin states in the affidavit she learned from a records check that Patton was "convicted as a sex offender" based on a May 29, 2003 arrest in Clackamas County. Ex. Q, at 4. The affidavit relays the details resulting in the conviction: (1) Patton confessed to Detective Delehant that he brought a sixteen-year-old male to a motel room on two occasions to have oral and anal sex; (2) Patton brought his laptop to the motel to show the sixteen-year-old triple XXX images of underage males; (3) a search of the laptop located images of children engaged in sexual activities; and (4) Patton was charged with Sexual Material Involving a Child and Sex Abuse III.

Patton relies on a transcript of Patton's interview with Detective Delehant in which Patton explained the teenager was interested in viewing pornography during the second meeting so Patton brought some on his laptop. Patton said the pictures were of young gays, some were child

pornography, "[b]ut, actually, most of them are, uhm, triple XXX, I mean most of them aren't, they're, they're just naked."  Ex. Y, at 15.

Comparing the description of the conversation with the transcript, Patton argues the affidavit's version is inaccurate and misleading.

The government argues Patton's vague statement has to be interpreted to mean that at least *some* of the images were triple XXX, and whether Patton showed those images to the teenager or not, Patton admitted showing child pornography to the teenager and having sex with him.  The government thus argues any inaccuracy is minor and immaterial.

After reviewing the transcript, it is clear Patton admitted to showing pictures to the teenager which included some child pornography as well as some images Detective Delehant described as art.  Although Patton's term "triple XXX" is vague, Detective Goodwin's description is accurate.  The magistrate would have learned nothing material if the affidavit noted Patton also shared some nonpornographic pictures with the teenager.

Patton also claims it is difficult to determine what he was convicted of from the affidavit. He was convicted of Sexual Abuse III and Possession of Materials Depicting Sexually Explicit Conduct of a Child I.  The government contends the affidavit's description of Patton's earlier charges was accurate, and it notes Patton admitted to being convicted of those charges.

The affidavit states Patton was "convicted as a sex offender from a Clackamas County Sheriff's arrest on 5-29-03, documented in Clackamas County case 02-46255."  Ex. Q, at 4.  In the affidavit, Detective Goodwin explains she read the file for case 02-46522 and summarizes Patton's admissions to Detective Delehant.  She concludes that she learned based on Detective

Delehant's investigation, Patton was criminally charged with Sexual Material Involving a Child and Sex Abuse III.

I agree the wording in the affidavit could be better because a defendant is convicted of various sex crimes and not convicted as a sex offender. The magistrate could reasonably infer from this information, however, that Patton was convicted of the charges stated in the affidavit. Gourde, 440 F.3d at 1071. Patton does not claim the inference is inaccurate. The affidavit does not contain a false statement.

3.    CARES NW Interview

Detective Goodwin states in the affidavit she learned from reading the CARES NW interview report that on October 17, 2011, DG told Dr. Lippert that Patton took pictures of DG while DG was asleep and DG had recently learned Patton was a pornographer. DG said he was clothed when he posed for Patton but he was concerned "there might be picture [sic] of him that other people were viewing on the intranet [sic]." Ex. Q, at 5.

Patton argues DG did not visit CARES NW until October 26, nine days later than reported by Detective Goodwin, and did not make the statements until November 22, 2011, during his third CARES NW visit. In conjunction with the affidavit's statement that Detective Andler did not learn Patton's criminal history until October 26, Patton argues the incorrect date of DG's statements at CARES NW falsely informs the magistrate DG became aware on his own that Patton was a pornographer and offered the information to the CARES NW examiner without prompting. Patton contends the correct date indicates Detective Andler or another investigator informed DG of Patton's prior criminal history and directed the CARES NW examiner to question DG about pornography. Patton notes DG stated several times that Patton only took

pictures of him and his friends dressed in women's clothing. Patton suggests DG did not become concerned about any other photographs until Detective Andler informed him of Patton's criminal history and questioned him about any photographs without clothing. Patton claims there are no facts suggesting another source from which DG could have learned about Patton's criminal history.

The government admits the affidavit gives an inaccurate date for the CARES NW interview. DG was seen at CARES NW on October 26, 2011, November 1, 2011, and November 22, 2011 and made the statements at issue in the affidavit during the third interview. The government notes Patton does not challenge the accuracy of the statements in the affidavit, and his argument based on the inaccurate date is rank speculation unsupported by any evidence.

I agree Patton's argument is based on nothing but speculation. I will discuss the effect of the incorrect date in the summary section.

C.     Other Statements in the Affidavit

Patton raises several arguments about the remaining facts in the affidavit.

1.     Statements of Angelica, Jonny, and MG

Patton contends any statements by Angelica, Jonny, and MG should not be considered in the probable cause determination. First, he claims Angelica's statements were based solely on information from Jonny but Jonny's statements did not corroborate Angelica's. Second, Patton argues Jonny was not credible because Detective Andler fed Jonny information and prompted him to agree with it based on a promise to assist Jonny in his own criminal case. Third, Patton contends MG's statements are of little value because he never made an allegation of sexual abuse

against Patton, generally provided only gossip, and incorrectly reported DG was with Patton when he ran away in March 2012.

The government notes many of the facts were corroborated by multiple witnesses or other evidence: (1) Angelica and Jonny had similar accounts of the night they spent with DG at Patton's house in July 2011 and MG explained DG was alone with Patton in his bedroom; (2) Angelica and MG both directed Detective Andler to Patton's home and identified his car; (3) Angelica, Jonny, DG, and MG discussed the night they spent at Patton's house in November 2011 watching Brokeback Mountain[2] and sleeping in Patton's bedroom; and (4) the picture of Angelica, Jonny, DG, and MG dressed as women at Patton's house. The government also contends there is no evidence Detective Andler promised Jonny any benefits in his criminal case and repeatedly steered Jonny to only state what he saw or heard, and not what probably happened.

Thus, the government contends MG's, Jonny's, and Angelica's statements do not lack credibility and are more than mere gossip.

It is the magistrate's job to determine how much credibility to give each witness, based on sufficient accurate information in the affidavit to make the credibility determination. United States v. Nielsen, 371 F.3d 574, 580 (9th Cir. 2004) ("totality of the circumstances supporting the issuance of a warrant is based on an informant's veracity and reliability . . . and the basis of the informant's knowledge"). The affidavit does contain numerous corroborated facts, as explained

---

[2] "Brokeback Mountain is a 2005 epic romantic drama film directed by Ang Lee. It is a film adaptation of the 1997 short story of the same name by Annie Proulx with the screenplay written by Diana Ossana and Larry McMurtry. The film stars Heath Ledger, Jake Gyllenhaal, Anne Hathaway and Michelle Williams, and depicts the complex romantic and sexual relationship between two men in the American West from 1963 to 1981." Wikipedia, http://en.wikipedia.org/wiki/Brokeback_Mountain (last visited Aug. 15, 2013).

by the government. I see nothing on which to base a conclusion the magistrate was required to discount any witness's testimony in full.

2.    <u>DG's Statements</u>

Patton relies on <u>Stoot v. City of Everett</u>, 582 F.3d 910 (9th Cir. 2009), to argue DG's statements, on their own, do not support a finding of probable cause because they are not reasonably trustworthy.

In <u>Stoot</u>, the court held that a crime victim's statement, on its own, does not support a finding of probable cause if the statement is not reasonably trustworthy or reliable. The court found three factors compelled the conclusion that the victim's statements at issue could not establish probable cause on their own: (1) the victim was interviewed when she was four years old about events occurring more than a year earlier when she was three; (2) the victim changed her answers several times during a single interview; and (3) the victim confused the suspect with another boy during the interview. <u>Id.</u> at 919-20. The court reasoned these factors pointed to the need for additional investigation and corroboration to establish probable cause. <u>Id.</u> at 920.

DG's situation varies significantly from the victim's in <u>Stoot</u>. Most importantly, DG was first interviewed when he was twelve years old about conduct taking place less than a year earlier. This is a far cry from interviewing a four year old about conduct occurring more than a year earlier. There is no indication DG ever confused the identity of the adults who abused him. It is true DG was not forthcoming at first about the sexual abuse, but he provided more information as time passed and he became more comfortable talking to Detective Andler about the subject. Also importantly, some of DG's statements were corroborated. Angelica, Jonny, DG, and MG discussed the nights they spent at Patton's house in July and November 2011. For these reasons,

Stoot is distinguishable from the situation before me and is not a reason to ignore DG's statements.

Patton bases another argument on the Oregon Interviewing Guidelines the Oregon Department of Justice created to elicit reliable statements from children about possible abuse. The legislature enacted a statute requiring each county to develop a multidisciplinary child abuse team and investigation protocols and procedures. ORS 418.747. Patton argues DG's statements are not reasonably reliable because Detective Andler violated statutory protocol and guidelines during his investigation; in particular, he was not specially trained personnel who should have conducted the interviews of DG under ORS 148.747(4). Patton further contends Detective Andler conducted too many interviews, he did not document some of the interviews in any way and documented others in inadequate ways, and he did not take a neutral stance during the interviews.

The government responds the issue before the court is not whether Detective Andler employed the best possible interviewing practices with DG. That issue goes to the weight of the evidence at trial, not its admissibility. The question currently before the court is the accuracy of Detective Goodwin's affidavit, and Patton does not argue Detective Goodwin inaccurately related DG's statements to Detective Andler.

The affidavit states Detective Andler told Detective Goodwin "DG was not openly forthcoming with the details concerning these occasions in which he had sexual contact with men and often changed his account of what had happened." Ex. Q, at 3. The affidavit does not try to mislead the magistrate into believing Detective Andler followed the Oregon Interviewing Guidelines. Moreover, DG also was interviewed at CARES NW, which describes itself as a "collaborative, community-based medical program for the assessment, treatment and prevention

of child abuse." CARES NW, http://www.caresnw.org/who-we-are/ (last visited Sept. 4, 2013).

Its professionals would be trained in appropriate interview techniques.

In sum, Detective Andler's interview techniques do not negate probable cause.

3.    Patton's Criminal History

Patton argues his criminal history does not establish probable cause that he sexually

abused DG because the charges occurred nine years earlier.

Prior criminal history can be considered when determining if probable cause exists but

"cannot alone establish reasonable suspicion or probable cause." Burrell v. McIlroy, 464 F.3d

853, 858 n.3 (9th Cir. 2006). Patton's criminal history played only a small part in the probable

cause determination. The age of the conviction is a possible cause for concern, however. For

example, the court in United States v. Falso, 544 F.3d 110, 123 (2nd Cir. 2008), held that an

18-year-old child abuse conviction is only marginally relevant, if at all, to the probable cause

determination in a search warrant because there was no evidence of ongoing impropriety which

would make the prior offense look less aberrational. Patton's conviction is half that old.

Moreover, there is evidence of ongoing impropriety including DG spending the night sleeping

with Patton in his bed and witness statements that Patton would pay for sex acts with minors.

Patton's 2003 conviction would not be enough to establish probable cause on its own, but it is not

so stale the magistrate is prohibited from considering it in the probable cause determination.

D.    Summary

After making all corrections Patton argues are needed, he claims the magistrate could only

find probable cause by ignoring four months of DG repeatedly denying Patton abused him and

relying on the statement DG made during the interview in January 2012 when Detective Andler

coerced him.  I note the affidavit expressly states DG was not openly forthcoming about his sexual contact with men, often changed his account of what happened, and expressed concern about getting his friends in trouble.  Thus, the magistrate was fully informed and could determine whether DG was credible.

I concluded above that Detective Goodwin should have included or corrected four pieces of information in the affidavit:  (1) the arrests of Angelica and Jonny; (2) DG's inconsistent statements about his whereabouts when he ran away; (3) Angelica's October 26, 2011 statement that Jonny had sex with DG incorrectly reported as Patton having sex with DG; and (4) the incorrect CARES NW interview dates.

There is no need for me to consider whether the affidavit's omissions and errors are intentional or reckless because once all required corrections are made, there is a fair probability that officers would find evidence of the crimes of sex abuse and sodomy in the locations to be searched.  Thus, probable cause exists.  The facts supporting probable cause include the following.  DG finally admitted having sexual contact with Patton and MG was concerned that DG had done so.  DG, MG, Jonny, and Angelica and twice spent the night at Patton's house, DG had slept with Patton in his bed when others were in the room, and DG had been alone with Patton in his bedroom.  Jonny heard Patton and DG kissing.  Patton is a registered sex offender.  DG had Patton's number on his cell phone and the two had exchanged text messages.  MG's phone had a picture of DG and the others dressed in women's clothing in Patton's kitchen.  DG said Patton took pictures of him when he was asleep.  DG tested positive for a sexually transmitted disease when examined at CARES NW.

Because probable cause still exists after the disputed statements are corrected, Patton has failed to meet the burden which would entitle him to a <u>Franks</u> hearing. Thus, I deny his motion seeking one.

II.     <u>Search and Seizure of Computers for Child Pornography</u>

Patton argues that even if there was probable cause to search his residence for evidence of the crimes of sexual abuse and sodomy, there was no probable cause to seize and search his computers and other electronic devices for child pornography. Patton relies on a recent Ninth Circuit case, <u>Dougherty v. City of Covina</u>, 654 F.3d 892 (9th Cir. 2011), to argue allegations a person sexually abused a minor, standing alone, are insufficient to establish probable cause to believe the person possessed child pornography.

Police officers in <u>Dougherty</u> investigated allegations that a sixth grade teacher inappropriately touched one of his female students. The investigation turned up prior allegations of similar conduct. <u>Id.</u> at 896. The officers obtained a search warrant to look for child pornography in Dougherty's home and on his computer. <u>Id.</u> at 895-96. No charges were filed and Dougherty brought suit alleging Fourth Amendment violations. <u>Id.</u> at 896-97. The court granted qualified immunity to the officers after finding a constitutional violation:

> Under the totality of the circumstances, a search warrant issued to search a suspect's home computer and electronic equipment lacks probable cause when (1) no evidence of possession or attempt to possess child pornography was submitted to the issuing magistrate; (2) no evidence was submitted to the magistrate regarding computer or electronics use by the suspect; and (3) the only evidence linking the suspect's attempted child molestation to possession of child pornography is the experience of the requesting police officer, with no further explanation. Our circuit, however, has not previously addressed this question. Therefore, the officers involved in the search are entitled to qualified immunity.

<u>Id.</u> at 895.

Based on the discussion in <u>Dougherty</u>, Patton raises several issues about Detective Goodwin's affidavit: (1) it did not establish probable cause to believe Patton possessed child pornography; (2) it contained no information from which the magistrate could reasonably conclude Detective Goodwin had the experience or expertise with crimes involving child pornography or sexual abuse of children to give meaning to the boilerplate language in the affidavit; (3) it attempted to link collectors and purveyors of child pornography with sexual interest in children, but did not state that people who sexually abuse children possess child pornography; (4) it reports that people who induce children to engage in sexual behavior *may* document their efforts, rather than stating they *typically* or *often* do so; (5) it does not provide facts to support the inference that Patton engaged in inducement behavior; (6) it relies on Patton's stale 2003 conviction as a sex offender who used child pornography during his interaction with the 16-year-old male; and (7) it does not state facts to support a conclusion that people documenting the inducement of children keep the documentation for long periods of time.

The government contends Detective Goodwin's affidavit detailed more than just the sexual abuse of DG, and further, that <u>Dougherty</u> was narrowly decided on the specific facts of the case. Moreover, the government notes the split among the circuits on the issue of "whether evidence of child molestation, alone, creates probable cause for a search warrant for child pornography." <u>Dougherty</u>, 654 F.3d at 899. I am aware of the split, as well as Judge Tallman's concurrence in <u>United States v. Needham</u>, 718 F.3d 1190, 1202-03 (9th Cir. 2013), calling <u>Dougherty</u> a flawed decision whose categorical rule ignores "common sense bolstered by police experience with child sex predators." <u>Dougherty</u>, however, is the law of the Circuit.

The government distinguishes Detective Goodwin's affidavit from <u>Dougherty</u> in several ways. The affidavit reports: (1) Patton's ongoing impropriety with minors, thus allowing the magistrate to consider the 2003 conviction; (2) Patton showed child pornography on a computer to groom a 16-year-old boy prior to having sex with him; (3) Angelica's statement that he, Jonny, and DG watched Brokeback Mountain with Patton at his home before spending the night with Patton in his bed; (4) DG told a CARES NW doctor Patton photographed him while asleep; (5) a correlation between the production and possession of child pornography and a sexual interest in children; and (6) the picture of DG in women's clothing in Patton's kitchen were digital images on MG's cell phone, which could also be stored on a computer. Based on these differences, the government argues there was probable cause to search computers for any digital images, even ones which were not pornographic.

As an initial matter, Patton contends there was no evidence at all he owned a digital camera or a home computer. However, the affidavit states Patton reported for his annual sex offender registration three months before the affidavit was completed and, at that time, Patton listed his employment as a self-employed Internet marketing consultant. The magistrate may draw reasonable inferences when making the probable cause determination. <u>Gourde</u>, 440 F.3d at 1071. It is reasonable to infer that a self-employed Internet marketing consultant would have some form of home computer or other device that could access the Internet.

Patton also takes issue with Detective Goodwin's statement that based on her experience, education, and training, she knows people who possess child pornography "view children as sexual objects, are sexually interested and aroused by children and that such persons receive

sexual gratification from viewing sexually explicit images of children." Ex. Q, at 10. I agree that this statement does not link people who molest children to the possession of child pornography.

There are other facts in the affidavit, however, which distinguish Patton's situation from the situation in Dougherty. The affidavit explains Patton's 2003 convictions, including that he groomed the teenage victim by showing him child pornography Patton brought along to the motel on his laptop computer. Although that conviction was nine years old at the time the magistrate approved the search warrant, "there are cases where it may be appropriate for a district court to consider a dated sex crime; for example, where there is evidence of ongoing impropriety, because in such cases the prior offense would tend to be less aberrational." Falso, 544 F.3d at 123 (refusing to consider 18-year-old conviction because it was stale without any evidence of ongoing impropriety and the conviction did not relate to child pornography). One of Patton's 2003 convictions was for the possession of Sexual Material Involving a Child. Moreover, there was evidence of ongoing impropriety based on DG's allegations, Jonny's statement that Patton and DG were kissing in his bed, and MG's statement that DG was alone with Patton in his bedroom.

Next, the affidavit explains DG said Patton took pictures in his sleep and DG was concerned people might be viewing them on the Internet. Neither the affidavit nor the underlying CARES NW report state whether DG said the pictures were of him clothed or unclothed. It is a reasonable inference, however, that DG would not be concerned anybody would want to view pictures of him clothed.

Finally, the affidavit explains Patton showed Brokeback Mountain to DG, MG, Angelica, and Jonny and they then slept at Patton's house and in his bedroom. Brokeback Mountain could

conceivably be used to groom a minor for homosexual activity, and the movie could be located on a digital device.

Based on these facts, I conclude Dougherty is distinguishable and does not require me to find there was no probable cause to search for child pornography.

The government also argues two fallback positions if probable cause to search for child pornography was lacking:  (1) inevitable discovery; and (2) the good faith exception.

Under the inevitable discovery doctrine, " if, by following routine procedures, the police would inevitably have uncovered the evidence, then the evidence will not be suppressed despite any constitutional violation."  United States v. Young, 573 F.3d 711, 722 (9th Cir. 2009) (internal quotation omitted).  After executing the search warrants, Detective Goodwin reported the various digital devices contained over 1,000 images and videos of young males, most of whom appeared to be less than 18 years old and either posed in a sexually explicit manner or engaged in lewd sexual conduct.  Clearly there was probable cause to search the digital devices for files other than child pornography, such as photographs of DG.  During that search, the investigators would have come across an image of child pornography, given the vast number of images on the devices. They could have stopped the search and obtained an additional warrant to search for child pornography, based on probable cause created by the image they saw.  Thus, the police would have inevitably discovered the child pornography, and there is no need to suppress it.

Under the good faith exception, evidence obtained pursuant to a search under a warrant lacking probable cause is not suppressed if the officer acts in objectively reasonable reliance on the warrant.  United States v. Underwood, No. 11-50213, 2013 WL 3988675, at *8 (9th Cir. Aug. 6, 2013).  The good faith exception does not apply if the affidavit is "so lacking in indicia of

probable cause as to render official belief in its existence entirely unreasonable." Id. (internal

quotation omitted). "An affidavit is so lacking in indicia of probable cause, or bare bones, when it

fails to provide a colorable argument for probable cause. A colorable argument is made when

thoughtful and competent judges could disagree that probable cause does not exist." Id. (internal

quotation and citation omitted). As I explained above, I believe the warrants at issue here are

distinguishable from the warrant in Dougherty and that probable cause exists. Accordingly,

competent judges could disagree, even if the appellate court finds probable cause did not exist;

thus, I also find the good faith exception applies.

For these additional reasons, I deny Patton's motion to suppress evidence of child

pornography.

III.     Specificity of Warrants

On June 8, 2012, the first search warrant authorized officers to search for evidence of

Sexual Abuse in the first degree, ORS 163.427, and Sodomy I, ORS 163.405 and to seize:

> such evidence including, but not limited to, computers, digital cameras, mobile
> phones, electronic data storage devices, the movie Broke Back [sic] Mountain,
> paperwork documentation of occupancy, DNA evidence, photographs of [DG],
> video tape, undeveloped film or other visual depictions of child sexual abuse, child
> erotica, information pertaining to the sexual interest in child sexual abuse, sexual
> activity with minors, and/or which contains, retrieves, produces and/or otherwise
> make available visual depictions of minors engaged in sexually explicit conduct, or
> which is used to maintain records, correspondence, diaries, other writings
> representing the sexual molestation and/or exploitation of minors, and/or any other
> electronic evidence to identify/eliminate potential suspects.

Ex. T, at 1.

On June 27, 2012, Detective Goodwin obtained a warrant to allow the NWRCFL to search the electronic evidence seized pursuant to the June 8, 2012 warrant for evidence of the same crimes and to seize the same list of evidence. Ex. X.

The Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." Patton moves to suppress all evidence obtained pursuant to the search warrants because they were overbroad in violation of the Fourth Amendment. He claims Detective Goodwin sought the warrant to find evidence of a crime for which there was no probable cause–the possession of child pornography.[3]

"Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." United States v. Banks, 556 F.3d 967, 972-73 (9th Cir. 2009) (internal quotation omitted).

A.    Brokeback Mountain

The affidavit states that on November 10, 2011, Angelica told Detective Andler that Angelica, Jonny, MG, and DG watched the movie Brokeback Mountain at Patton's home before Jonny, DG, and Patton slept together in Patton's bed. Patton argues Angelica is not a credible source, but I did not adopt his argument for reasons stated above. His primary argument is that

---

[3] Patton raises a few points concerning the execution of the warrant, such as some books that were seized, the fact the officers did not seize any items to examine for body fluids or "touch DNA," the fact that Detective Goodwin did not provide NWRCFL with a photograph of DG, the fact that the warrants were not timely returned, and the execution date of the NWRCFL warrant. I decline to address these points because Patton's motion concerns the legality of the warrants themselves, and not the execution of the warrants.

officers seized a DVD of Brokeback Mountain, obviating any need to search the electronic devices for the video. Patton claims the authorization was overbroad.

The government contends if the movie was seized pursuant to the warrant, its existence corroborates Angelica's statement and could be used at trial to bolster Angelica's credibility. The government also argues the movie is evidence of Patton's intent to groom DG for sex. It notes the affidavit did not specify the format of the movie the group watched, and Patton could have had multiple copies including some in electronic format. Thus, the government claims the second warrant was not overbroad.

I agree with the government that a movie can be in multiple formats stored in multiple locations. There was probable cause to seize any copies of Brokeback Mountain the officers located because any copies of the movie could corroborate the witnesses' description of what happened the night the group watched the movie at Patton's house. The authorization was not overbroad to allow a search for the movie in any format.

Patton's argument actually takes issue with execution of the warrant. He complains the officers should have stopped looking for the movie once they located it on a DVD. The officers needed to seize whatever format DG had viewed, however, even if Patton owned more than one. The affidavit did not provide enough information to narrow the search, and I know of no requirement the detectives needed to further investigate the format of the movie prior to obtaining the warrant.

B.    Digital Cameras and Photographs of DG

Patton argues the warrant was overbroad in authorizing the search and seizure of digital cameras or photographs of DG because those items lacked the required nexus to the underlying

facts.  The affidavit states that a photograph of DG, MG, Jonny, and Angelica standing in a kitchen while dressed in women's clothing was found on MG's phone.  The group had dressed up at Patton's home before going to a nightclub.  Patton contends the only inference based on this evidence is that MG asked Patton to take a photograph of the group on MG's cell phone.

I disagree because there are other ways for a photograph to get on a cell phone.  For example, Patton could have taken the picture with his own cell phone and texted it to MG's cell phone.  Likewise, the photograph could have been taken with MG's cell phone and sent to Patton's cell phone or emailed and stored on his computer.  Finding the photograph on any digital device owned by Patton would be evidence of a relationship between Patton and DG.  Probable cause existed to look for the photograph, and any others of DG, on any digital devices owned by Patton.

The affidavit states DG reported to a CARES NW interviewer that Patton took pictures of him while DG was asleep and DG posed for Patton to take pictures with DG clothed.  Patton contends this is not evidence he took photographs of DG, but rather that DG was concerned something happened that he was unaware of until after he learned from Detective Andler that Patton was a pornographer.

The government notes there is no evidence DG ever said he learned from Detective Andler that Patton was a pornographer and, similarly, no evidence the photos on MG's phone were the only photos Patton took.  According to the government, photos of DG taken by Patton would be important evidence of the crimes of sexual abuse and sodomy, even if the photos are innocent, because they establish a connection between Patton and DG, they corroborate the statements of

DG and the other witnesses, and if photos of DG sleeping were seized, they establish he spent the night with Patton.

Patton's argument is not a fair interpretation of what DG said. Additionally, DG could have learned from MG, Angelica, or Jonny of any photographs Patton took while DG was asleep because the group spent the night together at Patton's house.

In summary, the warrant was not overbroad in authorizing the search and seizure of digital cameras or photographs.

C.     Paperwork Documentation of Occupancy

Patton notes there was no question he occupied the residence to be searched, and the affidavit does not allege any criminal activity taking place at the Milwaukie residence, so there was no need to seize paperwork documentation of occupancy.

The government argues some of the items in the residence searched would have belonged to Patton's roommate, so paper evidence within this category is needed to determine who possessed and controlled each item seized.

Evidence of occupancy can be legitimately seized to identify the ownership of other evidence. United States v. Shi, 525 F.3d 709, 732 (9th Cir. 2008) (probable cause existed to seize items to identify the suspect as the person in control of a particular area of a ship). The warrant was not overbroad in this regard.

D.     Computers and Electronic Data Storage Devices

Patton argues the affidavit fails to state facts explaining why a forensic examination of all of his computers and electronic devices was necessary to recover hidden files. Patton further argues the warrant lacked sufficient particularity in authorizing the search of the electronic

devices and provided no standards for conducting the search of the electronic devices, failing to even limit the seizure to items belonging to Patton or to items within a relevant time frame.

The government claims Detective Goodwin did not know what computer equipment Patton owned or on which devices he might have stored evidence of the alleged crimes. Thus, all devices had to be seized and searched by a computer forensic laboratory. The government further claims probable cause extended to all computers and electronic devices within the premises because Patton had access to his roommate's computer equipment. In the affidavit, Detective Goodwin states she has learned from her experience, education, and training that highly trained experts are needed to search computers and electronic devices to protect the integrity of the evidence and recover hidden, erased, compressed, password protected, or encrypted files and to protect against booby traps designed to destroy evidence.

The difficulty law enforcement encounters when searching a computer for files, even seemingly innocent ones like nonpornographic photographs of DG, is that the filename does not have to be related to the content of the file. "Images can be hidden in all manner of files, even word processing documents and spreadsheets. Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer." United States v. Hill, 459 F.3d 966, 978 (9th Cir. 2006). The lack of a search protocol is not fatal to the issuance of a warrant. Id.

Patton contends the affidavit does not state facts supporting an inference that evidence of the alleged abuse of DG would be found on his electronic devices. Patton claims there is no evidence he communicated with DG online or through email or used his computers in any way to commit the abuse.

This is a rehash of the argument based on <u>Dougherty</u>.  I explained above why I was not persuaded by this argument.

E.      <u>Evidence Used to Maintain Records, Correspondence, Diaries, and Other Writings Representing the Sexual Molestation and/or Exploitation of Minors</u>

Patton claims the affidavit contained no facts from which the magistrate could infer Patton maintained this type of record, or that the items were evidence of a crime or likely to be found in his home.

The government notes Detective Goodwin stated in the affidavit that, based on her training and experience, people who engage in criminal behavior to induce children to engage in sexual behavior may document the efforts, either on paper or electronically, and that the documentation is found in their vehicles or residences.  This statement provides probable cause to search for this category of evidence in Patton's home and on his computers.  The warrant was not overbroad.

**CONCLUSION**

Defendant's Motion to Suppress Evidence and for a <u>Franks</u> Hearing [17], Defendant's Motion to Suppress Evidence of Child Pornography [15], and Defendant's Motion to Suppress Evidence Obtained from Warrants Lacking Specificity [19] are denied.

IT IS SO ORDERED.

Dated this _____16th_____ day of September, 2013.


___/s/ Garr M. King_____
Garr M. King
United States District Judge